OPINION OF THE COURT
Scott Fairgrieve, J.
Petitioner moves for summary judgment in favor of petitioner against respondent for the sum of $415,932.30, and to dismiss respondent’s counterclaims.
Petitioner commenced this nonpayment proceeding against respondent to recover the sum of $281,810.59, and possession of the premises located at One Old Country Road, Suite 428, Carle Place, New York (hereinafter referred to as premises).
Respondent filed the verified answer, dated April 16, 2015. Respondent admits the allegations of paragraph 2 that it entered into a lease with Treeline Inc. (owner’s predecessor), wherein respondent agreed to pay monthly rent of $15,019.50.
Respondent denies the allegations contained in the rider to the verified answer by asserting lack of knowledge or information sufficient to form a belief to the following:
*202 1 (a) CLK/HP, One Old Country LLC and HLP Old Country TIC LLC is the owner of the premises.
1 (b) BACM 2005-6 foreclosed on the property.
1 (c) William J. Garry was appointed receiver of the property on September 17, 2012.
1 (d) Receiver filed his oath and bond on December 13, 2013.
1 (e) Property manager is John Proscia of Colliers International.
The answer contains numerous affirmative defenses (paragraph lettering does not follow manner set forth in answer):
(a) Actual partial eviction.
(b) Constructive eviction.
(c) Respondent has been barred and excluded from the parking lot.
(d) Failure of consideration.
(e) Petitioner and its predecessors failed to take reasonable action to prevent damage to the premises (parking garage) which has resulted in the improper and illegal actual or partial eviction.
(f) The obligation to pay rent terminated when the Town of North Hempstead ordered the closing of the parking lot. In the alternative, respondent is entitled to a rent abatement.
(g) Statute of frauds, equitable estoppel and unclean hands.
(h) The parking garage was closed by the order of the Town of North Hempstead in March of 2014. The receiver was appointed on September 17, 2012. Petitioner waited 15 months before assuming his duties on December 23, 2013. Petitioner thereby delayed performing his duties upon his appointment for 15 months. During this period, petitioner could have collected almost $10,000,000 in rent which could have been used to repair and/or complete emergency repairs to the parking garage. This course of conduct may have caused the Town not to close the garage and respondent may not have been barred and excluded from the parking garage (part of the demised premises).
Respondent also asserts a counterclaim and additional affirmative defenses. Numerous facts (allegations) are set forth as follows (paragraph lettering does not follow the numbering of same in the verified answer):
(a) Respondent leased the premises from Treeline Management Corp.
*203 (b) Treeline sold the premises to HLP Old Country TIC LLC, CLK/LP One Old Country Rd LLC (CLK).
(c) The lease was amended on November 25, 2009, to set the termination date of the lease for October 31, 2016.
(d) Respondent had ample parking with reserved spaces for two senior partners (article 13 of lease).
(e) The parking provided by the three-story garage is part of the demised premises and is appurtenant thereto.
(f) Respondent employs 14 lawyers, one paralegal, four secretaries, one calendar clerk, one billing clerk, one bookkeeper, one title clerk and one intern, for a total of 21 employees.
(g) Respondent states the following about the closing of the parking garage and the parking situation presently:
“Forty-Fourth: On March 28, 2014, at 2:00 p.m., Petitioner closed the entire parking lot and advised all tenants that they needed to vacate the parking lot by 6:00 p.m., that evening. Thereafter, Petitioner barricaded the entrances to the parking garage and placed security guards at all entrances and exits thereby physically excluding all tenants from this portion of the Demised Premises. This exclusion from a portion of the demised premises continues through today.
“Forty-Fifth: In order to provide parking, Petitioner leased a portion of a parking lot, in a shopping center, approximately three miles east of the building, on Old Country Road and provided busing for all tenants, their staff, and employees. Limited valet parking was provided at the building for some tenants, some employees, and visitors.
“Forty-Sixth: On or about June 1, 2014, Petitioner obtained limited use of the parking garage, for a limited number of tenants, valet only. Most tenants, their staff, and employees still had to and continue to use the buses from the offsite parking to get to and from the office.
“Forty-Seventh: From March 28, 2014 to on or about June 1, 2014, all tenants were required to use the offsite parking and take the bus. Depending upon the time of day, traffic on Old Country Road, and waiting time, this bus ride could take anywhere from 20 to 40 minutes.
*204 “Forty-Eighth: After June 1, 2014, limited parking was made available, onsite, by valet only, for some percentage of the total number of people working at the Building. Respondent was allocated only ten (10) parking places for its staff of 21 employees. The balance had to continue to take the bus and continue to take the bus today.
“Forty-Ninth: The valet parking has not alleviated all the problems. At some times, the delay with the valet parking can be worse than the time it takes to take a bus. Depending on the time of arrival, there is a line out the entrance of the Building, eastward up Old Country Road. Between 8:30 and 10:00 in the morning, it can take as much as one half hour to get onto the building site and to reach the valets. Leaving the building, between four and six, can be worse. Often, there are 12-15 or more people waiting for their car. The valet leaves at 7:30 p.m. in the evening: If you work late, as attorneys are generally required to do, you must leave your office, collect your car, park in an available space, if any, and then return to your office.”
(h) The loss of the parking spaces has greatly impacted the daily operations of respondent to conduct business.
(i) These circumstances create grounds for an actual partial eviction or constructive eviction.
(j) The closing of the parking garage and the failure to provide on-site parking constitutes a breach of contract.
(k) Respondent claims damages in excess of $500,000.
(l) The obligation to pay rent has been suspended.
Petitioner responded with a verified reply to counterclaims, dated April 27, 2015. The reply denies the allegations set forth in the answer of respondent; except that it admits that the premises had a parking structure and admits that valet parking was instituted and that it provided shuttle services to and from the Fortunoff s parking lot.
Numerous affirmative defenses were asserted in the reply (paragraph lettering does not follow manner set forth in the reply):
(a) The parking garage is not part of the demised premises.
(b) The lease allows repairs and/or improvements to the parking garage without abatement of rent.
(c) Respondent’s counterclaims are barred by the lease.
*205 (d) Counterclaims are barred by the doctrine of waiver and doctrine of estoppel.
(e) Respondents have use of the parking garage through a valet system.
(f) Petitioner did not wrongfully oust the tenant.
(g) The parking garage was closed pursuant to governmental orders.
(h) Respondent currently occupies the premises.
In support of the motion for summary judgment, petitioner submits the affidavit of William J. Garry, sworn to November 11, 2015. Petitioner was appointed receiver on September 17, 2012, and filed his oath and bond on December 28, 2013.
Petitioner delayed 15 months in qualifying because the lender and owner/landlord requested this action because they tried to negotiate a settlement but this failed.
Petitioner immediately qualified as receiver once he was notified that the settlement negotiations had failed. A notice to attorn dated December 23, 2013 was served upon all tenants including respondent.
Petitioner states that the premises were constructed in 1969 and have 315,000 square feet of office and accessory retail space. The building has a parking garage connected to the building by an underground walkway.
The Town of North Hempstead closed the parking garage on or about March 28, 2014 due to unsafe conditions. Thereafter, petitioner arranged for the tenants to park off-site at Fortunoff and provided shuttle transportation to and from the off-site location.
Certain repairs were made to the parking garage (under the direction of the Town) which allowed the parking structure to be reopened in May of 2014; the upper deck remains closed.
Valet service was set up for parking at the property for safety reasons. Respondent received 12 parking passes even though respondent is only entitled to two reserved spots.
Petitioner (receiver) counters as follows to the respondent’s arguments that he failed to act properly with respect to repairing the parking garage:
“17. First, as mentioned above, there was no delay as the Lender and Landlord requested that I refrain from qualifying while said parties attempted to negotiate a resolution to the foreclosure lawsuit. Secondly, the issues relating to the Parking Garage began long before I was appointed *206 Receiver. Moreover, had I qualified at an earlier date and collected the monies during the period in question, the funds collected would not have covered the cost of the repairs of the Parking Garage, which is over $8 million dollars! Lastly, the repairs to the Parking Garage constitute a capital improvement, and the Appointing Order does not authorize me to pay for such improvements.
“18. For these reasons, Respondent cannot hold me responsible for the closure of the Parking Garage.”
As of November 11, 2015, respondent owes $415,932.30 in rent and additional rent for which respondent was billed. Petitioner requests a money judgment with a judgment of possession and warrant of eviction.
Petitioner submits the affirmation of attorney Richard A. Blumberg, dated November 10, 2015 in support of the motion for summary judgment. The lease between Treeline Mineóla, LLC and respondent leased suite 428 to respondent. The lease defines demised premises as suite 428.
Article 13 of the lease provides respondent with two reserved parking spaces which may be relocated by landlord. Respondent is also allowed to use other parking spaces at the building except for those spaces designated for use by the other tenants.
The original lease was amended on November 25, 2009 to extend the term of the lease to October 31, 2016 and provide additional space for respondent.
Petitioner argues that the parking spaces are not part of the “demised premises.” This court rejects this argument out of hand and will not address this subject other than to state that parking was an integral part of the lease between the owner Treeline and respondent. See paragraph 13.01 of the lease:
“13.01. Landlord shall provide Tenant with two (2) reserved parking spaces, in the parking area designated for use by tenants of the Building, and the related parking passes, at no cost to Tenant for use throughout the term of this Lease; provided, however, that if Tenant requires replacement of any parking passes, Tenant shall pay to Landlord the sum of $350.00 per parking pass prior to the issuance of same. Landlord reserves the right to relocate Tenant’s reserved parking spaces within the parking areas for the Building, provided that Tenant’s parking spaces are at all times within reasonable proximity to the Building or to Tenant’s *207 reserved parking, spaces that Landlord seeks to relocate. Tenant shall not have the right to use any other parking spaces at the Building, except for those that are not designated for use by other tenants, other than Tenant’s reserved parking spaces. In the event that Tenant defaults under the Lease, as modified hereby, beyond the expiration of any applicable grace period, Landlord may immediately and without notice to Tenant permanently revoke Tenant’s reserve parking provided hereunder.”
Article 7, entitled “REPAIRS,” has two clauses which pertain to this dispute between the parties:
“7.03. There shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of any inconvenience, annoyance or injury to Tenant’s business arising from the making of any repairs, alterations, additions, improvements in or to any portion of the Building or the Demised Premises or in or to fixtures, appurtenances or equipment thereof by Landlord, Tenant or any other tenant or other third party. Landlord shall exercise ordinary diligence in performing work in the Building so as to minimize interference with Tenant’s business operations, if possible, but shall not be required to perform any work on an overtime or premium pay basis to avoid, reduce or minimize any such interference.”
7.05 states:
“7.05. Notwithstanding anything to the contrary herein contained, in the event that Landlord is required to perform any repairs in the Demised Premises, under no circumstances and in no event shall Landlord be required to perform same on overtime or premium pay hours. Landlord shall be entitled to perform such repairs during normal business hours on business days, if Landlord deems it appropriate, and Tenant shall not be entitled to any rent abatement as a result of the conduct by Landlord or repair work in the Demised Premises.”
In opposition to the summary judgment, respondent submits the affirmation of Donald W. Henderson, Esq., dated April 22, 2016. Respondent states that it rented space in a first-class office building, with ample on-site parking for its staff and two reserved parking places.
*208 In March of 2014, the parking on-site was closed for two months and petitioner lost its parking spaces. Repairs were made to the parking garage which allowed the on-site parking to reopen but only with limited valet parking. This constitutes a breach of the lease which forms the basis of the counterclaim. Respondent states that “the damages, lost productivity and costs are extensive.” The actions of petitioner constitute a constructive eviction, and/or actual partial eviction.
Respondent claims that the loss of parking has caused it to reduce the size of its law firm, which specializes in medical malpractice defense and elder law.
Respondent blames the inaction of the receiver for delaying 15 months to assume his office. The owner, BACM 2005-6 Carle Place Office LLC, continued to collect the rent “even though it was enjoined from doing so.”
Paragraph 10 of the affirmation in opposition provides the basis of the claim of neglect by the receiver in carrying out his duties:
“10. One of the defenses, in this nonpayment proceeding, results from this failure of Receiver to comply with the Court order, begin collecting the rent and begin maintaining the building. Had Receiver done as he was required and taken control of the building, in September 2012, he would have collected sufficient money and had sufficient time to address the problems in the parking lot and the closing of the garage may not have occurred. Had the Receiver acted timely, as required by the order, pursuant to which he was appointed, the lawsuit may not have been necessary. During this period, upon information and belief, the owner and prior landlord collected millions of dollars in rent. This claim forms the basis of our Latches and similar affirmative defenses, as set forth in paragraph Eleventh, Twelfth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth and Twentieth of our answer.”
These actions or lack thereof has caused respondent to suffer extensive damages: loss of productivity of lawyers and staff.
Decision
Paragraph 7.03 of the lease provides that the tenant is not entitled to any rent abatement; nor can the landlord be held liable for any inconvenience, annoyance or injury to tenant’s *209 business resulting from repairs. Paragraph 7.05 also states that there will be no rent abatement resulting from the repairs made by the landlord.
Since the lease provisions authorize repairs without abatement of rent, there can be no claim for actual partial eviction nor for constructive eviction. (See Winston Churchill Owners Corp. v Churchill Operating Corp., 193 AD2d 396 [1st Dept 1993]; Cut-Outs, Inc. v Man Yun Real Estate Corp., 286 AD2d 258 [1st Dept 2001]; Ernst v Straus, 114 App Div 19 [1st Dept 1906]; Two Rector St. Corp. v Bein, 226 App Div 73 [1st Dept 1929].)
If this court were to accept respondent’s arguments that a constructive eviction and/or actual partial eviction occurred, and give legal effect to these arguments, then this approach would emasculate the legal significance of the clauses in the lease which allow repairs without abatement of rent. In Cut-Outs, Inc. v Man Yun Real Estate Corp. (286 AD2d at 260), the Court stated:
“In rendering its decision, however, the trial court neglected to consider or discuss the effect of the exculpatory provisions of the lease, specifically, article 4 (‘Repairs’), article 13 (‘Access to Premises’), article 20 (‘Building Alterations and Management’), and article 31 (‘Elevators, Heat, Cleaning’), which defendant invoked in its opening statement at trial and in its post-trial submissions. Those provisions specifically authorized defendant to perform the work in question without incurring liability to plaintiff, and without abating plaintiff’s obligation to pay rent. Plaintiff’s argument that the exculpatory provisions do not protect acts that would otherwise constitute a partial actual eviction or construction eviction, if accepted, would largely read them out of the lease.”
Likewise, in 737 Park Ave. Acquisitions, LLC v Eastside Comprehensive Med. Servs., LLC (44 Misc 3d 1207[A], 2014 NY Slip Op 51048[U], *6-7 [Civ Ct, NY County 2014]), the court upheld commercial exculpatory clauses:
“It has been held that ‘exculpatory’ lease clauses such as those present in Winston Churchill Owners Corp v Churchill Operating Corp., supra, and in the subject lease ‘specifically authorized [the landlord] to perform the work in question without abating [the tenant’s] obligation to pay rent.’ *210 CutOuts, Inc. v Man Yun Real Estate Corp., 286 AD2d 258, 260 (1st Dept. 2001). In that case, the First Department went on to explain that the tenant’s ‘argument that the exculpatory provisions do not protect acts that would otherwise constitute a partial actual eviction or constructive eviction, if accepted, would largely read them out of the lease.’ Id at 260; see also Jackson v Westminster House Owners, Inc., 24 AD3d 249 (1st Dept. 2005); Huron Assocs, LLC v 210 East 86th Street Corp., 18 AD3d 231 (1st Dept. 2005); Two Rector Street Corp. v Bein, 226 App Div 73 (1st Dept. 1929).
“Indeed, it is well settled that ‘when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.’ W.W.W. Assoc., Inc. v Giancontieri, 77 NY2d 157, 162 (1990). The courts will not rewrite a commercial contract, including a lease agreement, which is negotiated at arm’s length by sophisticated counseled parties. See Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470 (2004). In Pacific Coast Silks v 247 Realty, LLC, 76 AD3d 167 (1st Dept. 2010), the First Department explained that ‘while residential tenants require protection from nonnegotiable form leases . . . commercial tenants, such as plaintiff, that are able to negotiate the terms of their leases, require no such protection.’ Further, ‘if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity' (Greenfield v Philles Records, Inc., supra at 569), even if this results in an economically harsh result to one of the parties. See Soldiers’, Sailors’, Marines’ and Airmen’s Club, Inc. v Carlton Regency Corp, 95 AD3d 687 (1st Dept. 2012); Murray Hill Mews v Rio Restaurant Assocs., 92 AD3d 453 (1st Dept 2012); CBS, Inc. v P.A. Building Co., 200 AD2d 527 (1st Dept. 1994). Thus, while application of the above-mentioned terms of the subject lease, which are quite broad and clearly favor the landlord, does result in some harsh consequences to the tenant, this court cannot re-write the parties’ agreement.”
In Jackson v Westminster House Owners Inc. (24 AD3d 249, 250 [1st Dept 2005]), the Court reiterated the principle that an *211 eviction claim cannot lie where the repairs are authorized, “no matter how extensive or the degree of interference with the tenant’s occupancy”:
“But alterations to leased premises, made with the consent of the tenant, do not amount to an eviction, no matter how extensive or the degree of interference with the tenant’s occupancy (see Two Rector St. Corp. v Bein, 226 App Div 73 [1929]). Here, the entry for making repairs was made pursuant to a right reserved in the proprietary lease, to which the tenants, by signing the lease, consented (see Winston Churchill Owners Corp. v Churchill Operating Corp., 193 AD2d 396 [1993]).”
In the case at bar, the respondent continued in possession of the office space and continued to use the on-site parking provided. Thus, there is no constructive eviction. A case in point is Matter of Scolamiero v Cincotta (128 AD2d 224 [3d Dept 1987]), wherein the tenant failed to vacate the leased premises and renewed the lease. The Court held there was no constructive eviction regarding the leasing of the parking space to another tenant. The tenant’s claims were restricted to the amount of damages suffered in the diminution of use of the parking spaces:
“However, in order to claim constructive eviction tenant must vacate the premises Union Dime Sav. Bank v Frohlich, supra; Meerbaum v Crepes D’Asie, 85 Misc 2d 345), which, of course, tenant did not do. On the contrary, tenant, with full knowledge of the situation, exercised her option to renew and remained in the premises. Having done so, she has waived any claim of constructive eviction. Therefore, the most that tenant suffered is a diminution in the extent to which she could enjoy the use of the parking area (see, Barash v Pennsylvania Term. Real Estate Corp., supra, [26 NY2d] at 84).” (Id. at 226.)
Since respondent remained in possession, the obligation to pay rent continues, even where the conditions might have warranted an abandonment. (See Barash v Pennsylvania Term. Real Estate Corp., 26 NY2d 77 [1970]; Pasqua v De Marchi, 31 AD2d 781 [4th Dept 1969]; West Broadway Glass Co. v I.T.M. Bar, 245 AD2d 232 [1st Dept 1997].)
Respondent cannot deny not owing the rent on the basis of a claim that there was a diminution of the beneficial enjoyment *212 of the property, i.e., less parking, when respondent remains in possession and uses the parking provided. (See Mosbacher v Cleaners Enters., 19 Misc 2d 624 [Mun Ct, Bronx County 1959]; Edgerton v Page, 20 NY 281 [1859]; Two Rector St. Corp. v Bein, 226 App Div 73 [1st Dept 1929].)
Since respondent continues to use the parking provided, even if the usage is greatly diminished, claims of constructive eviction will fail. (See Arpino v Cicciaro, 38 Misc 3d 129[A], 2012 NY Slip Op 52392[U] [App Term, 2d Dept, 9th & 10th Jud Dists 2012]; 737 Park Ave. Acquisitions, LLC v Eastside Comprehensive Med. Servs., LLC, 44 Misc 3d 1207[A], 2014 NY Slip Op 51048[U] [Civ Ct, NY County 2014].)
Based upon the above, respondent is liable for the rent owed. This court will conduct an assessment of damages on the rent owed by respondent to petitioner.
Respondent asserts claims of damages resulting from the change of parking. Petitioner contends that counterclaims cannot be asserted because of paragraph 27.01 of the lease which states: “If Landlord commences any summary proceeding for nonpayment of rent, with the exception of a compulsory counterclaim, Tenant shall not interpose and hereby waives the right to interpose any counterclaim of whatever nature or description in any such proceeding.”
However, this court finds that respondent’s counterclaims are “inextricably intertwined” with the claim for rent, and thus are permitted. (See All 4 Sports & Fitness, Inc. v Hamilton, Kane, Martin Enters., Inc., 22 AD3d 512, 514 [2d Dept 2005]; Haskell v Surita, 109 Misc 2d 409 [Civ Ct, NY County 1981]; 3 Robert F. Dolan, Rasch’s Landlord and Tenant — Summary Proceedings § 43.40 [Waiver of right to interpose counterclaim] [4th ed].)
Furthermore, the counterclaim is allowed as a setoff against the receiver without leave of court, as a reduction to the rent owed; no claim is being made that the receiver is individually liable. (See Canale v New York State Dept. of Taxation & Fin., 84 Misc 2d 786 [Ct Cl 1975]; Young v Yerks, 205 Misc 867 [Mun Ct, Queens County 1954]; Hecker v Maffucci, 267 App Div 994 [2d Dept 1944].)
In the case at bar, a question of fact exists as to whether the petitioner breached the lease concerning the repair of the parking garage with the resulting claims of damages suffered by respondent. (See Appliance Giant, Inc. v Columbia 90 Assoc., *213 LLC, 8 AD3d 932 [3d Dept 2004] [holding whether lessor’s construction activities breached terms of sublease was for the jury]; see also Arbern Realty Co. v Clay Craft Planters Co., 188 Misc 2d 314 [App Term, 2d Dept 2001].)
Even though respondent cannot establish constructive eviction because it has not abandoned the premises and has continued using the limited parking facilities, respondent may recover the difference between the value of the leased premises as they were intended and the value as a result of the breach. (City of New York v Pike Realty Corp., 247 NY 245 [1928]; PJI 6:14 Landlord and Tenant—Defenses and Counterclaims—Constructive Eviction.) See also West Broadway Glass Co. v I.T.M. Bar (245 AD2d at 232-233), wherein the Court held that the tenant is entitled to the difference between the value of the leased premises as intended and the value as a result thereof:
“There was no constructive eviction here because the tenant never did abandon the premises (see, Barash v Pennsylvania Term. Real Estate Corp., 26 NY2d 77), instead continuing its renovation on assurances from the landlord that the problem would be remedied. Nonetheless, as the trial court noted, there was a breach of the lease due to the landlord’s renting of premises it knew to be untenantable. However, this does not automatically trigger a 100% rent abatement, because a tenant in possession still remains obligated to pay rent. Rather, the tenant’s loss should be the difference between the value of the leased premises as they were intended and the value as a result of the breach (City of New York v Pike Realty Corp., 247 NY 245). The measure of such damages remains to be determined. (See, e.g., Greenblott v Catskill Off-Track Betting Corp., 215 AD2d 627; Ciraolo v Miller, 138 AD2d 443.)”
Another case having relevancy to the matter at bar on damages is Appliance Giant, Inc. v Columbia 90 Assoc., LLC (8 AD3d at 934), which held:
“Here, Supreme Court inconsistently ruled that plaintiff’s lost profits were both consequential damages that could not be awarded for breach of quiet enjoyment, because the sublease excluded the recovery of consequential damages, and direct damages that could be awarded for breach of the parking requirement. In our view, however, plaintiff’s direct damages are the actual rental value of the *214 parking spaces lost due to defendant’s breach, and they must be proven by expert testimony as to the portion of the rent allocable to those spaces (see 487 Elmwood v Hassett, supra at 289). Lost profits, even if shown to be foreseeable and caused by defendant’s breach, are an item of consequential damages as to both of the breaches shown by plaintiff and, thus, are excluded by the terms of the sublease (see Scott v Palermo, 233 AD2d 869, 870 [1996]).”
Based upon the above, this court rules that all consequential damages are excluded by paragraph 7.03 of the lease, which excludes respondent from showing any losses except for general (direct) damages by expert testimony.
Conclusion
Given the foregoing, this matter is set down for a settlement conference in District Court of Nassau County, 99 Main Street, Hempstead, New York, Civil 1, room 279, on July 20, 2016 at 10:00 a.m. It is hereby mandated that all parties are to appear with their clients, who have decision-making power to resolve this case.
If this case cannot be resolved, then the matter will proceed to immediate trial on an assessment of damages for the rent due petitioner. The amount of rent awarded will be subject to offset for the general (direct) damages suffered by respondent, as proved by expert testimony.
Petitioner contends that no actual or constructive eviction may occur if the government orders repairs. Thus, since the Town of North Hempstead ordered the closing of the parking garage, respondent cannot claim damages for actual or constructive eviction (citing 2 Robert F. Dolan, Rasch’s Landlord and Tenant — Summary Proceedings §§ 28:8, 28:13 [4th ed]).
However, a review of Rasch’s section 28:13 reveals that a landlord may be held liable if a tenant can demonstrate that the landlord failed to act properly in carrying out its duties. (See Snow v Pulitzer, 142 NY 263 [1894]; Lindwall v May, 111 App Div 457 [2d Dept 1906]; Al’s 334 9th Ave. Corp. v Herbener, 83 NYS2d 676 [Sup Ct, NY County 1948]; Rasch’s § 28:73 [Acts of public authorities — Where landlord at fault].)
In section 28:73, Judge Dolan writes: “If the acts impairing or destroying the use and enjoyment of the leased premises are due to the fault of the landlord in not performing his duties, then such acts will constitute an eviction.”
*215 Even though petitioner was ordered to close the parking garage for repairs, the totality of the circumstances presented by respondent raise questions of fact as to whether petitioner acted promptly in repairing the parking garage and the extent of the repairs. Even though respondent didn’t vacate the premises, and continued to use the parking services presented, respondent is entitled to offset the damages as outlined herein.
Thus, a trial will be held immediately on the above issues if there is no resolution.